IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| DAVID WINTERS, #364-915,<br>   *Plaintiff*,<br><br>v.<br><br>WARDEN BOBBY SHEARIN,<br>DR. STEPHEN SCHELLHASE,<br>LAURA MOULDEN,<br>VICKY WARNICK,<br>CHARLOTTE ZIES, and<br>BRUCE LILLER,<br>   *Defendants*.[1] | Civil Action No. ELH-11-1749 |

**MEMORANDUM**

Defendants filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment ("Motion") (ECF 12). Because the Motion is accompanied by affidavits and other documentary evidence, it shall be treated as a motion for summary judgment. *See* Fed. R. Civ. P. 12(d), 56. No opposition has been filed.[2] Upon review of the Motion, the Court finds that a hearing is unnecessary. *See* Local Rule 105.6 (D. Md. 2011).

**Background**

On June 23, 2011, David Winters, then and now incarcerated at North Branch Correctional Institution ("NBCI"), submitted correspondence stating that, "back in February" (presumably, February 2011), he was "tattoo'd" by correctional officers. He also complained that he could not obtain additional education at the institution, but this claim was not permitted to

---

[1] The Clerk shall amend the docket to reflect the full and complete spelling of defendants' names.

[2] Pursuant to the dictates of *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), on November 18, 2011, the Clerk informed plaintiff that a dispositive motion had been filed, that plaintiff had seventeen days in which to file a written opposition to the motion, and if plaintiff failed to respond, the case could be dismissed, without further notice. *See* ECF 20.

proceed.³ *See* ECF 1, 3. His court-ordered supplemental complaint (ECF 4) was deficient in that it failed to name specific correctional employees responsible for the alleged February 2011 tattooing/assault. The supplement did, however, indicate that Winters has been diagnosed with paranoid schizophrenia and anxiety disorder. *See* ECF 4 at 8. The nature of the pleading provided a sufficient basis for this Court to require counsel for the State to address whether injunctive relief should be granted so that Winters could obtain access to mental health care. It is Winters's access to mental health treatment, and not the alleged assaultive misconduct on the part of correctional personnel, that is at issue here.⁴ Winters seeks money damages and injunctive relief requiring his transfer to a mental hospital⁵ and the posting of an African-American "F.B.I. Agent at [his] cell door to watch and keep [him] safe."⁶ ECF 4 at 12.

### Standard of Review

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides, in part, that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law." The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

---

³ Programming for incarcerated individuals is not constitutionally mandated. Thus, any failure to provide educational opportunities for an adult prisoner does not state a cognizable civil rights claim under 42 U.S.C. § 1983. *See, e.g.*, *Altizer v. Paderick*, 569 F.2d 812, 815 (4th Cir. 1978); *Awalt v. Whalen*, 809 F. Supp. 414, 416-17 (E.D. Va. 1992).

⁴ As noted in the Order of August 18, 2011 (ECF 12), to the extent Winter wishes to pursue an excessive use of force claim against the officers for any alleged assault, he may file a separate action. ECF 12 at 1-2, n.2.

⁵ Plaintiff is serving a life sentence for first-degree murder. *See State v. David Winters*, No. 109552C (Montgomery County Md. Cir. Ct. Sept. 2, 2010). To the extent he seeks to overturn his conviction or sentence, he may pursue a habeas corpus action in this Court *after* completion of post-conviction review in the Maryland state courts.

⁶ Plaintiff contends in various pleadings that he is African-American, Caucasian, Jewish, Muslim, or Christian. A review of medical records filed in this case confirms that he is Caucasian. His religious affiliation, if any, is less clear.

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 247-48 (1986) (emphasis in original).

In resolving a summary judgment motion, the court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The "party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (citation omitted).

The "judge's function" in reviewing a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249. If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," there is a dispute of material fact that precludes summary judgment. *Id.* at 248. Nevertheless, the court must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

**Discussion**[7]

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). In order to state an Eighth Amendment claim for denial of medical care, plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff was aware of the need for medical attention but failed either to provide it or to ensure the availability of the needed care. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

There is no underlying distinction between the right to medical care for physical ills and its psychological and psychiatric counterpart. *See Bowring v. Goodwin*, 551 F.2d 44, 47 (4th Cir. 1977). A prisoner is entitled to such treatment if a "[p]hysician or other health care provider, exercising ordinary skill and care at the time of the observation, concludes with reasonable certainty (1) that the prisoner's symptoms evidence a serious disease or injury; (2) that such disease or injury is curable or may be substantially alleviated; and (3) that the potential

---

[7] Defendants raise non-exhaustion of administrative remedies as an affirmative defense. ECF 12 at 12-13. According to Scott S. Oakley, Executive Director of the Inmate Grievance Office ("IGO"), Winters filed one grievance with the IGO, requesting his return to Clifton T. Perkins Hospital. ECF 19, Exhibit 1A, Declaration of Scott S. Oakley, at ¶ 3. That grievance was dismissed for failure to state a claim upon which administrative relief could or should be granted. *Id.* Under 42 U.S.C. § 1997e(a) (1996), exhaustion of administrative remedies is mandatory for prisoner litigants. Given that this case involves delivery of psychological services to a prisoner with mental impairment, the court shall accept Winters's truncated pursuit of an IGO complaint as a sufficient attempt to exhaust administrative remedies.

for harm to the prisoner by reason of delay or the denial of care would be substantial." *Id.* The *Bowring* court further concluded that the aforementioned right to such treatment is based upon the essential test of medical necessity and not upon that care considered merely desirable. *Id.* at 48. "Disagreements between an inmate and a physician over the inmate's proper care do not state a § 1983 claim unless exceptional circumstances are alleged." *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985).

Recent clinical assessment indicates that Winters, who previously was housed at Clifton T. Perkins Hospital Center, suffers from an anxiety disorder and schizophrenia, most likely schizotypal personality disorder, and paranoid personality disorder. *See* ECF 19, Exhibit 3 at 29. His treating psychiatrist, defendant Schellhase, describes Winters's "attempts at manipulation," and indicates that Winters refuses to try any medication that may alleviate his symptoms. *Id.* Despite his refusal to accept psychopharmacological treatment, Winters receives psychotherapy and crisis intervention treatment through the NBCI Psychology Department. *Id.*, Exhibit 2, Declaration of Laura Booth-Moulden, NBCI Mental Health Counselor, at ¶4. As of July 20, 2011, Winters has resided on NBCI's Special Needs Unit ("SNU"). Exhibit 1 at ¶5. The SNU is a modified general population program for the specialized treatment of prisoners suffering from severe mental illness. *Id.*, Exhibit 1 at ¶ 5; Exhibit 2 at ¶ 6; Exhibit 3 at 000029.

Mental health records demonstrate that Winters has received numerous visits from mental health experts between December 28, 2010 and July 22, 2011.[8] On December 16, 2010, he was visited by Clarence E. Hawkins, MA. ECF 19, Exhibit 3 at 1. Although Winters displayed "Passive-Aggressive child-like behavior towards authority," he was not deemed "an imminent Suicide/Homicide risk." *Id.* On December 28, 2010, he stated to an officer "that he hates

---

[8] Winters claims that Dr. Bruce Liller and case manager Charlotte Zies failed to provide him access to the telephone on one occasion. ECF 10 at 1. A claim of constitutional dimension is not apparent. Therefore, Dr. Liller and Ms. Zies are entitled to dismissal from this case.

women" and would not talk to defendant Laura Moulden, the female mental health official then present.  *Id.* at 3.  On February 10, 2011, he was visited by Moulden due to "severe withdrawn and isolated behavior," a refusal to leave a contingency cell, and for "barely speaking to staff over at least a 7 day span."  *Id.* at 4.  During the visit Winters stated that he began having mental health issues at 17 years of age, and that he had been at Clifton T. Perkins "from February 2009 to September 2010" for a competency evaluation.  *Id.*  He further explained that he "last experienced hallucinations about 4 or 5 years ago."  *Id.*  Moulden noted that Winters's overall "mental status …[did] not necessarily reflect psychosis." *Id.* at 5.

On February 11, 2011, Winters informed Dr. Schellhase that he was reluctant to take medication because it makes him sick.  *Id.* at 7.  Schellhase indicated that Winters's behavior could be due to metabolic problems.  *Id.*  Responses to questions were slow but logical, and Schellhase found that further testing would be needed for a proper diagnosis of Winters's mental condition.  *Id.*  Winters would not permit the further testing because it required a "trial on an antipsychotic medication."  *Id.*

On February 15, 2011, Moulden noted that Winters was more talkative and "forthright with information" during their session, but still "slow in providing the information." *Id.* at 9. Winters discussed "his military and family history," including the paranoia he felt towards his military instructors "because they were spitting on him." *Id.*  During his time in the military he became interested in and began to learn about Islam.  *Id.*  He then discussed his home life and gave accounts of his negative relationship with his parents.  *Id.*   When asked if he had ever "considered killing anyone else" he responded that "he's thought about killing his mom" but quickly recanted the statement.  *Id.*  He stated that he had heard voices in the past and that he was hearing them today, but Moulden was skeptical, because Winters would not "show his face." *Id.*

Moulden concluded that Winters's responses were slow but logical, that his changes in behavior were possibly due to "a metabolic concern," and that she would discuss with staff Winters's request to be celled with a Muslim inmate.  *Id.* at 10.

On February 23, 2011, Winters told Moulden that he could not go back to his cell because it "drives him crazy to be alone." *Id.* at 11. Moulden concluded that double celling might help Winters because "he was not displaying these bizarre behaviors in [general population]." *Id.*  During the session Winters demonstrated "intact thought processes", and explained that "auditory hallucinations would go away" if he had a cell mate.  *Id.*  On February 25, 2011, Winters did not show up for his appointment.  On March 23, 2011, Winters met with Moulden after staff placed him on behavioral observation for "bizarre behavior."  *Id.*  These behaviors included "banging his hands against his ears, and appearing to fight someone." *Id.* at 13.  During the interview Winters expressed that he is an African-American, even though he is Caucasian, and discussed how he recently made a weapon because he "wanted to go to court." *Id.*

On April 12, 2011, Winters was interviewed by Psychology Associate Vicky Warnick. Winters indicated he was "bored" and would like a "cell mate who is African-American . . . Christian, and small in stature," although he still identified himself as Muslim. *Id.* at 14.  He also stated that he was Jesus Christ that day, and "admit[ted] to using fear of CO's raping him as a means of getting out of segregation." *Id.*  Although Winters claimed to suffer continually from "visual & auditory hallucinations," he declined medication. *Id.*  Warnick further noted that Winters demonstrated a dislike for Caucasians and insisted that "his skin color is black," until she challenged him on the point. *Id.*  Warnick noted that he was "rational during much of the session." *Id.*

During an April 21, 2011 interview with Winters, Warnick informed him that he might not be able to get into the SNU[9] due to his "unstable [mental health] status." *Id.* at 16. In response, Winters stated: "'I can't stay in this cell any longer, I am suicidal.'" *Id.* (quoting plaintiff). Winters was transferred to the Psychology Office, where he stated that he was diagnosed with "paranoid schizophrenia and anxiety disorder-type 1 while at Perkins and that he is now entitled to a psychological placement at Springfield Hospital." *Id.* Winters denied hallucination or psychosis and stated that he was "not suicidal in the psychology office, but would be suicidal if returned to his cell." Warnick noted her suspicion that this statement was a "clear indication that [Winters] was malingering for secondary gain," using "suicide to dictate housing," and using his mental health symptoms "to dictate transfer to a Mental Health Hospital." *Id.*

Four days later, on April 25, 2011, Winters seemed euphoric during his session with Warnick, and gave "no evidence of psychosis." *Id.* at 18. When Warnick confronted him with her suspicion that he had been "exaggerating his symptoms and mental health concerns to dictate housing," Winters admitted to "feigning to get attention, [and] to get out of segregation." *Id.* He wanted to get back with two other inmates who were in general population. *Id.* That same day Winters was also visited by Dr. Schellhase. *Id.* at 19. Dr. Schellhase found no evidence of psychosis or mania and indicated he suspected that Winters's improved condition might be related to his possible transfer to the SNU. *Id.*

On April 28, 2011, Warnick made an entry indicating that she had received numerous letters from Winters "alleging abuse by various professionals, inmates and custody who have

---

[9] As noted, the SNU is a modified general population program for specialized treatment of NBCI prisoners suffering from severe mental illness. *Id.*, Exhibit 2 at 6; Exhibit 3 at 29.

come in contact with him." *Id.* She opined that Winters lacked credibility "due to suspected malingering to dictate housing." *Id.*

On May 25, 2011, Correctional Officers Randolph Keefer and Benjamin Friend found Winters in his cell, covered in feces and attempting to hang himself with a bed sheet. When Winters would not obey orders that he stop, Keefer applied pepper spray to Winters's face. Winters immediately became compliant and came to his door slot to present his hands for cuffing. *See* ECF 9, Exhibit 1A at 18.

Moulden visited Winters on May 26, 2011, for suicide monitoring. She indicated "[t]he incident was not described as severe" as not much weight was placed on his neck and there was no loss of consciousness. *Id.* at 23. During the interview, Winters admitted that he pretended that he was going to kill himself to get out of his cell. *Id.* He stated that while the suicide attempt was not real, he still heard voices. *Id.* Moulden noted her suspicion that Winters exaggerated his genuine psychotic disorder "for secondary gain." *Id.*

A "psychology team" visited Winters on June 9, 2011, to "review for possible SNU admission." *Id* at 25. He "derailed several times" during the interview with talk of the torture that white people had committed against his ancestors during WWII. *Id.* Winters "became angry and left the room when offered a phone call to his mother as a behavioral incentive." *Id.* Despite this conduct he was deemed appropriate for transfer. *Id.*

Winters met with Moulden on June 10, 2011. Moulden informed Winters that he would be recommended for transfer to SNU. *Id.* at 26. Winters requested and received a phone call with his mother but was soon escorted out of the room after becoming increasingly agitated. *Id.* Moulden noted her recommendation that he not be given further phone calls with his mother "until he is demonstrating less paranoid ideation." *Id.*

Schellhase interviewed Winters on July 22, 2011, with respect to anxiety and paranoia. *Id.* at 29.  Schellhase noted that Mr. Winters could benefit from "a trial of an atypical antipsychotic agent," but Winters was not willing to be medicated.  *Id.*  Dr. Schellhase's "Formulation" of July 22, 2011, was:

> Anxiety Disorder NOS.  More historical information is needed.  It would be of benefit to see the records from CT Perkins, but doubt schizophrenia.  Schizoid schizotypal PD are in the differential diagnosis at this stage as is Paranoid Personality Disorder.  Would begin by treating his anxiety with an SSRI.  May benefit from a trial of an atypical antipsychotic agent to target his anxiety.  At this time he is not willing to cooperate with a trial of any medication.

ECF 19, Exhibit 3 at 29.  Dr. Schellhase's "Plan Instructions" were: "Recommend further evaluation by psychology department, including obtaining information from CT Perkins. RTC[10] prn[11] if patient becomes amenable to a trial of medication."  *Id.*

Nothing in the record suggests Winters was "tattooed" or denied appropriate treatment for his serious mental health condition.  Winters refuses to take medication that might ameliorate his symptoms and anxiety.  He is known to manipulate symptoms and situations in an effort to obtain the housing status he desires.  Winters is not entitled to housing and treatment in his preferred mental health facility.  He has failed to demonstrate any violation of his Eighth Amendment right to psychiatric care.

Based on the undisputed facts and evidence before it, this Court concludes that defendants are entitled to summary judgment in their favor.  A separate Order follows.

Date:   December 15,  2011             /s/
                                       Ellen Lipton Hollander
                                       United States District Judge

---

[10] The Court assumes this abbreviation means "reconsider therapeutic change."

[11] PRN is the abbreviation for the Latin phrase "pro se nata," or "when the occasion arises."  *See* STEDMAN'S MEDICAL DICTIONARY (27th ed.).